```
 1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

 3        UNITED STATES OF AMERICA,

 4                  Plaintiff,

 5         v                              No. 21-cr-20746

 6

 7        DWIGHT A. RASHAD,

 8                  Defendant.
          _____/

 9

               EVIDENTIARY HEARING - VOLUME I of II
10
            BEFORE THE HONORABLE GERSHWIN A. DRAIN
11              UNITED STATES DISTRICT JUDGE
           Theodore Levin United States Courthouse
12              231 West Lafayette Boulevard
                    Detroit, Michigan
13              Tuesday, October 14, 2025

14    APPEARANCES:

15
              For the Plaintiff:    MR. THOMAS FRANZINGER
16                                  United States Attorney's Office
                                    Drug Task Force
17                                  211 W. Fort Street
                                    Detroit, Michigan  48226
18                                  (313) 226-9774

19            For the Defendant:    MR. TODD RUSSEL PERKINS
                                    Perkins Law Group
20                                  615 Griswold
                                    Suite 400
21                                  Detroit, Michigan  48226
                                    (313) 964-1702

22    Reported by:            Merilyn J. Jones, RPR, CSR
23                            Official Federal Court Reporter
                              merilyn_jones@mied.uscourts.gov
24

25
```

```
 1                        TABLE OF CONTENTS

 2    WITNESSES:  PLAINTIFF                            PAGE
      DAVID BELLESTRI
 3         Direct examination by Mr. Franzinger          7
           Cross-examination by Mr. Perkins             29
 4         Redirect examination by Mr. Franzinger       55

 5    WITNESSES:  DEFENDANT
      None
 6
      OTHER MATERIAL IN TRANSCRIPT:
 7

 8    EXHIBITS:              Identified            Received
      Government's Exhibit 1        11                    13
 9
      Government's Exhibit 2        16                    17
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           Detroit, Michigan

2           Tuesday, October 14, 2025 - 2:39 p.m.

3           THE LAW CLERK:  All rise.  The United States District

4    Court for the Eastern District of Michigan is now in session.

5    The Honorable Gershwin A. Drain presiding.

6           Calling Criminal Case Number 2120746, United States

7    versus Dwight Rashad.

8           Counsel, please place your appearances on the record.

9           MR. FRANZINGER:  Good afternoon.  Thomas Franzinger on

10   behalf of the United States.

11          THE COURT:   Good afternoon.

12          MR. PERKINS:  Good afternoon, your Honor, and good

13   afternoon to your staff.  May it please this Honorable Court, my

14   name is Todd Russell Perkins, P-55623, appearing on behalf of

15   Mr. Rashad.

16          Mr. Rashad, can you state your name.

17          THE DEFENDANT:  Dwight Rashad.

18          THE COURT:   Good afternoon to you also.

19          You all may be seated.

20          All right.  We've got an evidentiary hearing scheduled

21   for this afternoon.

22          Are counsel ready to proceed.

23          MR. FRANZINGER:  In part, your Honor.  To let Mr.

24   Perkins and the Court know earlier today, I have anticipated

25   having two witnesses today.  One of them, Scott Czopek, he's a

```
 1   retired DEA task force officer, I believe, from the Southgate
 2   Police Department.  Mr. Czopek was prepared to testify at the
 3   original hearing that we had scheduled on this motion.  Since
 4   that date was rescheduled, I have not been able to reach Mr.
 5   Perkins [sic].  He has not answered voice mails, text messages,
 6   phone calls.  I sent him a subpoena alerting him to today's
 7   hearing, and I can't find him.
 8            So, otherwise, I have Trooper David Bellestri from the
 9   Michigan State Police here to testify.
10            MR. PERKINS:  Other than him being able to regularly
11   call me, you said "Perkins", I agree with what he said.
12            As soon as brother counsel let us know that the
13   officer wasn't available -- he let me know.  I told him my
14   preference.  But I'm here.  We're here.  We have a witness, and
15   we can, you know, go at it as the Court sees fit.
16            THE COURT:  All right.
17            MR. PERKINS:  So, I don't -- no.  I don't have
18   anything further.
19            THE COURT:  Okay.
20            All right.  Well, the Court has had a chance to review
21   the motion to suppress and I'm prepared to take the testimony,
22   whatever is available now today.
23            MR. PERKINS:  Okay.
24            THE COURT:  Are you ready to call your first witness,
25   Mr. Franzinger?
```

```
 1              MR. FRANZINGER:  Your Honor, just so I'm clear, are we
 2    going to proceed with continuing the hearing -- proceed with
 3    what we have today and then continuing the hearing?
 4              If I can locate Mr. Czopek, I will keep the parties
 5    informed.
 6              THE COURT:  Okay.
 7              MR. PERKINS:  The only administrative thing I would
 8    ask, or procedural, is that motion for sequestration of any and
 9    all witnesses so that this testimony is only their own
10    throughout the pendency of the matter.
11              THE COURT:  Say that again, Mr. Perkins.
12              MR. PERKINS:  You know, without a motion for
13    sequestration, the testimony is available for anyone to review
14    legally.
15              So if I make a motion, and you grant it, it's just
16    within the province of that particular individual and maybe an
17    officer in charge, if brother counsel decides to have an
18    officer in charge present.
19              THE COURT:  Any comment about that?
20              MR. FRANZINGER:  No, your Honor.  I'm fine with
21    whatever the Court wants to do on that.  I'm not really sure I
22    follow the issue to be honest.
23              THE COURT:  Okay.
24              MR. FRANZINGER:  The witness we have today is --
25              MR. PERKINS:  Right.
```

1          MR. FRANZINGER:  -- is a Michigan State Police

2     Trooper.  I'm not sure anybody is going to be reviewing his

3     testimony.  I won't be supplying his testimony to anybody.  And

4     I think -- I think I should be able to find Mr. Czopek pretty

5     quickly.

6          So, I'm not -- I don't think that we need to be too

7     concerned about his testimony transcript floating around, but

8     I'll --

9          MR. PERKINS:  Understood.

10         I don't foresee that coming from brother counsel.  I

11    just like to be more cautious than -- because technically

12    without a motion for sequestration if we go to trial, they're

13    free to look at anything else to prepare themselves for the

14    testimony.

15         THE COURT:  That's true.

16         MR. PERKINS:  Yeah.  That's the only reason.

17         THE COURT:  Okay.

18         MR. PERKINS:  Yeah.

19         THE COURT:  All right, then, let's go ahead and

20    proceed with the witness that's available.

21         MR. FRANZINGER:  Yes, your Honor.

22         I'm calling Michigan State Police Trooper David

23    Bellestri.

24         THE COURT:  All right.

25         Mr. Bellestri, just step forward and my law clerk will

```
 1   give you an oath.
 2              THE LAW CLERK:  Please raise your right hand.  Do you
 3   solemnly swear or affirm that the testimony you are about to
 4   give to the Court shall be the truth, the whole truth, and
 5   nothing but the truth?
 6              MR. BELLESTRI:   I do.
 7                     D A V I D   B E L L E S T R I,
 8   called by the plaintiff at 2:43 p.m., sworn by the law clerk,
 9   testified as follows:
10              THE LAW CLERK:  You may be seated.
11                          DIRECT EXAMINATION
12   BY MR. FRANZINGER:
13        Q.   Good afternoon, Officer Bellestri.
14        A.   Good afternoon.
15              THE COURT REPORTER:  Please spell your last name.
16              THE WITNESS:  That's B, as in boy, E-L-L-E-S-T-R-I.
17        Q.   (By Mr. Franzinger, continuing)  Where do you
18   currently work?
19        A.   I work with the Michigan State Police.
20        Q.   And how long have you been with MSP?
21        A.   I've been a trooper for about 11 years.
22        Q.   And did you have any law enforcement experience before
23   joining MSP?
24        A.   No.
25        Q.   And what do you do for MSP?
```

1          A.    I'm a canine handler here in the second district.

2          Q.    And how long have you been a canine handler?

3          A.    For about eight years.

4          Q.    Can you explain what a canine handler is?

5          A.    As a canine handler, we carry out various functions,

6     specifically, how I -- my role is, is I have a narcotics

7     detection canine as well as a tracking and human detection

8     canine.

9          Q.    Now, were you in that role as a canine officer on

10    November 21st, 2019?

11         A.    Yes.

12         Q.    And were you on road patrol that day?

13         A.    I was.

14         Q.    And were you involved in a couple traffic stops?

15         A.    Yes, I was.

16         Q.    It's been nearly six years.  I'm going to guess you

17    don't remember that much about these particular incidents, do

18    you?

19         A.    Vaguely.

20         Q.    Did you write reports about them?

21         A.    I did.

22         Q.    Are you relying on those reports today as part of your

23    testimony?

24         A.    Yes, I am.

25         Q.    Now, according to your reports, both of these traffic

1    stops involved Ford F-150 pickup trucks, correct?

2         A.    Correct.

3         Q.    And the driver at each of those stops was named Dwight

4    Rashad?

5         A.    Yes.

6         Q.    Now, had you known Mr. Rashad prior to November 21st?

7         A.    I did not.

8         Q.    So how did you identify him?

9         A.    Based on the information I received from the DEA and

10   then on each stop with the license that was provided.

11        Q.    All right.

12              You mentioned that this was at the request of DEA, is

13   that why you were following the first F-150 on the afternoon of

14   November 21st?

15        A.    Yes.

16        Q.    Now, how often do you work with the drug enforcement

17   administration?

18        A.    Very frequently.

19        Q.    What kinds of things do you do for them?

20        A.    With the DEA it's primarily assisting them with larger

21   scale narcotic investigations.  Specifically, with interdiction

22   traffic stops and then search warrants of residence.

23        Q.    Now, this might seem obvious, but is that particular

24   to your role as a canine officer?

25        A.    Yes.

1     Q.    You mentioned traffic interdiction, do you receive

2    special training when you do traffic stops on behalf of DEA?

3     A.    I have had specific training for interdiction work.  A

4    few times, yes.

5     Q.    I guess what I'm asking is, do you use the same

6    procedures and tactics and protocols for traffic stops

7    regardless of who requests it?

8     A.    Yes.

9     Q.    Now, according to your report, the first -- on the

10   first traffic stop on that day, that took place on the M-10

11   Service Drive and Pembroke?

12    A.    Correct.

13    Q.    Why were you following this particular vehicle?

14    A.    I was given information -- I was requested by the DEA

15   to assist them with an ongoing narcotic investigation and with

16   the surveillance -- special agents running surveillance that day

17   directed me to one of their primary suspects in this

18   investigation.

19    Q.    What caused you to actually turn on your lights and

20   effectuate the stop?

21    A.    For the first stop was a window tint violation and a

22   turn signal violation.

23    Q.    So even if DEA hadn't contacted you and you had seen

24   those two features of a vehicle, could you have initiated a

25   traffic stop?

1      A.   Yes.

2      Q.   And did you write about those traffic violations in

3  your first report?

4      A.   Yes.

5      Q.   All right.

6           What happened at that, during that first traffic stop?

7      A.   Could I refer to my report?

8      Q.   Yes.

9      A.   Thank you, sir.

10          MR. PERKINS:  Can he identify which one that is.  Just

11  for the record.

12      (Whereupon Government's Proposed Exhibit 1 identified

13       for the record)

14          MR. FRANZINGER:  Your Honor, I'm going to mark this

15  report as Government Exhibit 1.

16          THE COURT:   All right.

17          MR. FRANZINGER:  Your Honor, may I approach the

18  witness?

19          THE COURT:   Yes.

20      Q.   (By Mr. Franzinger, continuing)  All right.  Officer

21  Bellestri, I've handed you Government Exhibit 1, what is that?

22      A.   That's my canine report for the first traffic stop

23  that I made on Mr. Rashad that day.

24      Q.   All right.

25           So, then, when you a moment ago, you asked can you

1    refer to your report, you were referring to that particular

2    report, correct?

3        A.   Yes, sir.

4        Q.   All right.

5             So -- and is this a fair and accurate copy of your

6    report, your first report?

7        A.   Yes, sir.

8             MR. FRANZINGER:  Your Honor, I'm going to move to

9    admit Government Exhibit 1.

10            THE COURT:   Any comment, Mr. Perkins?

11            MR. PERKINS:  Given the fact this is a motion hearing,

12   it is -- it's permissible.

13            THE COURT:   All right.

14            MR. PERKINS:  This is -- did you change the numbers

15   now?

16            MR. FRANZINGER:  I did now.

17            MR. PERKINS:  So, this is two?

18            This one is going to be two?

19            MR. FRANZINGER:  Correct.

20            MR. PERKINS:  Yeah.  Okay.

21            Nothing for this hearing, your Honor.

22            THE COURT:   Did I hear this is Exhibit 2?

23            MR. FRANZINGER:  This is going to be Exhibit 1, your

24   Honor, because I was planning on -- I've marked another thing

25   Exhibit 1 --

1          THE COURT:  Okay.

2          MR. FRANZINGER:  -- gave it to Mr. Perkins.  So I

3     appreciate his flexibility on this.

4          THE COURT:  Okay.

5          MR. FRANZINGER:  So, this is going to be Exhibit 1.

6          THE COURT:  All right.

7          MR. FRANZINGER:  This is a --

8          THE COURT:   It will be received.

9          MR. FRANZINGER:  Thank you.

10        (Whereupon Government's Exhibit 1 received into evidence)

11         MR. FRANZINGER:  This is a three-page report.

12     Q.   (By Mr. Franzinger, continuing)  All right.  Officer

13     Bellestri, according to this report, when approximately did this

14     traffic stop take place?

15     A.   Around approximately 1300 hours.

16     Q.   All right.

17         So what happened when you stopped Mr. Rashad?

18         MR. PERKINS:  My only objection would be is it appears

19     as though trooper is reading from the report.  I believe that

20     the standard is for him to use it to refresh his recollection,

21     if so.

22         And that's my only -- even if he has to go back and

23     forth, that's fine, just for the record.

24         MR. FRANZINGER:  Your Honor, this is a motion hearing.

25     We're talking about an incident that happened six years ago.  I

1  can ask Officer Bellestri if he adopts this report as part of

2  his testimony.  His testimony is just going to be the same

3  that's in the report, otherwise, we can pass the report back and

4  forth.  It's already been admitted.

5       MR. PERKINS:  Withdrawn, your Honor.  Withdrawn.

6       THE COURT: All right.  Go ahead.

7       MR. FRANZINGER:  Your Honor, this might come up with

8  the second report, which is longer as well.

9       So, all right.  We'll deal with it as we go.

10      THE COURT:  Maybe you should just ask him, when you

11 ask the questions, see if he has a response and if not, he can,

12 you know, look at the report, then.

13      MR. FRANZINGER:  Okay.  All right.

14      I did ask him, your Honor.  That's what prompted this.

15      MR. PERKINS:  I'm fine with it, your Honor.

16      THE COURT:  Okay.

17      MR. PERKINS:  He is right.  It's six years.

18      THE COURT:  Okay.

19      MR. FRANZINGER:  Appreciate that.

20      MR. PERKINS:  Yes.

21      MR. FRANZINGER:  I'll try to move things along more, a

22 little more efficiently here.

23      Q.   (By Mr. Franzinger, continuing)   This first traffic

24 stop took place.  Mr. Rashad was driving the vehicle, correct?

25      A.   Correct.

1    Q.    Do you remember what vehicle this was?

2    A.    It was a Ford F-150.

3    Q.    Do you recall who this vehicle was registered to?

4    A.    It was registered to Mr. Rashad.

5    Q.    So did you ask Mr. Rashad any questions when you

6    pulled him over?

7    A.    Yes.

8    Q.    Do you recall what you asked him?

9          What do you normally ask during a traffic stop?

10   A.    Not directly, but per my report and based on my habits

11   of making traffic stops, I asked him for his ID, identified him

12   as Mr. Rashad, and then, again, per my report, asked him for

13   consent to search his vehicle, to which he granted.

14   Q.    And how did you conduct that search?

15   A.    After removing him from the vehicle, I deployed my

16   narcotic detection canine on the interior -- exterior and

17   interior of the vehicle.

18   Q.    And what did your canine do?

19   A.    Canine Rex gave a positive identification to the odor

20   of narcotics on a pair of gloves within the vehicle.

21   Q.    And then did you conduct a search of the vehicle?

22   A.    Yeah.

23         After I put away Canine Rex, I began my now probable

24   cause hand search of the vehicle, but I did not locate any

25   contraband.

1     Q.   At that point was Mr. Rashad released?

2     A.   Yes.

3     Q.   All right.

4          So, later that afternoon were you again requested by

5     DEA to make a traffic stop?

6     A.   Yes.

7     Q.   And was that also on November 21st, 2019?

8     A.   Yes.

9     Q.   Do you recall what vehicle this was?

10    A.   It was again a F-150, but it was not the same one from

11    the prior traffic stop.

12    Q.   All right.  In front of you, Officer Bellestri --

13         MR. FRANZINGER:  Your Honor, may I approach the

14    witness?

15         THE COURT:   Yes.

16         THE WITNESS:   This is Exhibit 1, and a copy of

17    Exhibit 1.

18      (Whereupon Government's Proposed Exhibit 2 identified for

19      the record)

20         MR. FRANZINGER:  Your Honor, I'm handing the witness

21    what is marked Government Exhibit 2.

22    Q.   (By Mr. Franzinger, continuing)  All right.  Officer

23    Bellestri, do you recognize this?

24    A.   Yes.

25    Q.   And how do you recognize it?

1      A.   I recognize it as my report that I wrote following

2  this assist to the DEA that date.

3      Q.   All right.

4           Does this appear to be a fair and accurate copy of

5  your report?

6      A.   Yes.

7           MR. FRANZINGER:  Your Honor, I move to admit

8  Government Exhibit 2 as part of our response to defendant's

9  motion.

10          MR. PERKINS:  For the purpose of this hearing, no

11 objection, your Honor.

12          THE COURT:   All right.  Then it will be received.

13      (Whereupon Government's Exhibit 2 received into evidence)

14      Q.   (By Mr. Franzinger, continuing)  Officer Bellestri,

15 I'm going to draw your attention to the first page of Government

16 Exhibit 2, about halfway down this identifies the location where

17 this second stop took place, correct?

18      A.   Correct.

19      Q.   And this is on Trumbull Street in Detroit, Michigan?

20      A.   Yes.

21      Q.   Below that it also notes that date and time, November

22 21st, 2019 at 1300.

23           When did this second traffic stop actually take place?

24      A.   The second traffic stop took place later in the

25 evening.  I believe around 5 or 6 p.m.

1       Q.   So why does it say, "1300" on the first page of

2  Exhibit 2?

3       A.   How I write my reports, entering them into this

4  database, I document the time that I'm originally requested by

5  the agency that I'm assisting.

6       Q.   I believe, you already testified to this, but why were

7  you following Mr. Rashad the second time?

8       A.   Again, I was directed to my DEA agents conducting an

9  investigation and surveillance on Mr. Rashad.  Assist with their

10  investigation.

11      Q.   And what event caused you to actually turn on your

12  lights and initiate the stop?

13      A.   The moving violation that I observed Mr. Rashad

14  commit, which was a disregarding the yellow signal.

15      Q.   Now, in 2019 would this -- was your car equipped with

16  a dash cam recording device?

17      A.   Yes.

18      Q.   And would it have been -- would it have been recording

19  when you turned on your lights and initiated this stop?

20      A.   Yes.

21      Q.   Now, have you gone back to see if that dash cam

22  footage is still available?

23      A.   I did.

24      Q.   And what did you find out?

25      A.   That the footage no longer exists.

1      Q.    And do you know why it doesn't exist?

2      A.    Um, after I was unable to find it, I asked a sergeant

3  who was in charge of that and I was informed that multiple files

4  from that year were corrupted and no longer exist, including

5  this one.

6      Q.    Now the traffic infraction that you saw involving the

7  yellow light in the intersection, did you write that down in

8  your report at the time?

9      A.    I did.

10     Q.    So after you pulled the car over, who was inside the

11  vehicle?

12     A.    It was Mr. Rashad as the driver and a passenger in the

13  front seat, Mr. Martinez.

14     Q.    Did you recognize Mr. Rashad at that point?

15     A.    I did.

16     Q.    He was the same person you had seen earlier that day?

17     A.    Correct.

18     Q.    And how did you identify the passenger?

19     A.    I identified the driver -- the passenger with his

20  Arizona identification.

21     Q.    Did you have any other officers with you at the time?

22     A.    I did not.

23     Q.    So what did you do after you approached the vehicle?

24     A.    I would have informed them the reason for my stop,

25  identified both occupants, and then began my investigation by

```
 1    separating the occupants for, number one, safety, especially

 2    with the circumstances surrounding this case.  Separate them,

 3    but also begin asking them a lot of questions out of each

 4    other's ear shots.

 5         Q.   Why are you asking questions at this point?

 6         A.   I'm attempting to build my own reasonable suspicion

 7    and eventually probable cause to search this vehicle.

 8         Q.   Were either of the occupants under arrest at that

 9    point?

10         A.   At that point, no.

11         Q.   Were either of them restrained in any way?

12         A.   They were not.

13         Q.   Were they in handcuffs?

14         A.   No.

15         Q.   But they weren't free to leave at that point, were

16    they?

17         A.   Correct.

18         Q.   And did you speak to Mr. Martinez first?

19         A.   Based on my report I believe so, yes.

20         Q.   And are his -- are his answers to your questions

21    written in your report?

22         A.   The majority of them, yes.

23         Q.   Do you have any -- any independent recollection of

24    them today?

25         A.   No.
```

1    Q.    Can you -- do you recall, or can you summarize for us

2  what Mr. Martinez's answers were?

3    A.    Based on after reading my report and attempting to

4  recollect, my opinion at the time, that they were deceptive,

5  vague, and ultimately did not coordinate with my future line of

6  questions -- or answers I received from Mr. Rashad.

7    Q.    Did you ask Mr. Martinez about any of the items you

8  could see in the vehicle?

9    A.    I did.

10    Q.    What did you ask him about?

11    A.    I asked Mr. Martinez specifically about a leopard

12  printed duffle bag in the back rear passenger area of the

13  vehicle.

14    Q.    Had you seen that item or had you been told to look

15  out for it?

16    A.    I don't recall.  But I did see it.  But I don't recall

17  if that -- I was specifically made aware of that item.

18    Q.    All right.

19        So you asked Mr. Martinez about it, though, because

20  you could see it at that point?

21    A.    Correct.

22    Q.    Could you see anything of note in the truck?

23    A.    Not that I recall.

24    Q.    Did you ask Mr. Martinez about the nature of his

25  relationship with Mr. Rashad?

1    A.   I did.

2    Q.   Do you recall what he said?

3    A.   Um, after reading my report I do somewhat recall that.

4         Mr. Martinez stated that he knew Mr. Rashad since they

5    were kids together.

6    Q.   What did you think of that answer?

7    A.   It was odd to me because of the fact there's a 20-year

8    age difference between the two.

9         So immediately recognized it to be deceptive.

10   Q.   And did you note in your report Mr. Martinez's

11   physical appearance?

12   A.   I'd have to look at it.

13   Q.   All right.

14        I'm going to refer you to Page 2 of Government Exhibit

15   2.  First paragraph.

16   A.   You're asking if I documented his appearance?

17   Q.   Did you notice anything about his demeanor or his

18   behavior?

19   A.   Oh.  I don't know.  I don't document anything

20   specifically on Mr. Martinez, on his demeanor or behavior.

21   Q.   I'm going to draw your attention to the last sentence

22   of that paragraph?

23   A.   Oh.  Okay.  Sorry.  Yes.

24   Q.   What did you note in your report about his demeanor?

25   A.   That he appeared very nervous.

1   Q.   Is that something you typically note in your reports?

2   A.   If I do notice it, yes, and I believe it's important

3   to this investigation that I do, yes.

4   Q.   All right.

5        And then did you interview Mr. Rashad?

6   A.   I did.

7   Q.   And the same as before, was Mr. Rashad under arrest at

8   that point?

9   A.   He was not.

10   Q.   Do you recall where this interview took place in

11   proximity to the vehicles?

12   A.   Not specifically, but it would have been outside of

13   his vehicle.  I would have separated them both from the vehicle

14   they were in.

15        Again, for safety, especially based on the

16   circumstances surrounding this case, and so he'd be separated

17   from his vehicle.  Outside of it.

18   Q.   Did you give Mr. Rashad Miranda warnings?

19   A.   I did not.

20   Q.   Why not?

21   A.   At that time they were not under arrest.  They were

22   not in custody.

23   Q.   So you didn't give Mr. Martinez Miranda warnings

24   either?

25   A.   I did not.

1     Q.   And did you ask Mr. Rashad a series of questions?

2     A.   I did.

3     Q.   Are those responses documented in your report,

4 Government Exhibit 2?

5     A.   The majority of them, yes.

6     Q.   Did you ask him about a leopard-print bag?

7     A.   I did.

8     Q.   Why did you ask about the bag?

9     A.   Based on the circumstances of the information of the

10 case, one, it stood out to me that there was a lone duffle bag

11 in the vehicle.  With my training experience that's often where

12 the contraband, where contraband is kept.  And it also stood out

13 to me because it was a leopard-printed bag and there was two

14 males in the vehicle.

15     Q.   All right.

16     What did you think of Mr. Rashad's answers to your

17 questions?

18     A.   Again, that they were deceptive, contradicting to Mr.

19 Martinez's answers, and led me to believe that -- yeah, that's

20 it.

21     Q.   Did you ask Mr. Rashad about his relationship with Mr.

22 Martinez?

23     A.   I did.

24     Q.   Like how long they had known each other, for example?

25     A.   Yes.

```
1          Q.    How long did Mr. Rashad say they knew each other?

2          A.    Mr. Rashad stated that he knew Mr. Martinez for one to

3     two years.

4          Q.    And did you note Mr. Rashad's physical demeanor during

5     your interview?

6          A.    I did.

7          Q.    And what did you note?

8          A.    I noted that Mr. Rashad appeared very nervous,

9     especially when comparing to my prior interaction with him on

10    the last stop earlier, made earlier in the day.  And then I

11    specifically notate his rapid short breaths.  I could see his

12    carotid artery pulsating and I noted that he was stuttering

13    multiple times throughout our conversation.

14         Q.    Now at this point did you choose to deploy your

15    canine, Rex?

16         A.    I did.

17         Q.    How does that operate; how does that work?

18         A.    After all the occupants are separated from the

19    vehicle, which in this case they already were, I bring out my

20    canine and have him sit on the front, primarily on the front

21    driver side headlight area and then equip him with his

22    narcotic-detection collar around his neck and then give him the

23    command to search for narcotics which for Rex, it was "dope".

24         Q.    When you say "dope", what do you mean?

25         A.    It's just the command I give to Rex to search for
```

1    narcotics.

2        Q.   I understand.

3            So what is Rex trained to detect?

4        A.   Rex was trained to detect marijuana, cocaine, heroin,

5    crack, and methamphetamine.

6        Q.   And Rex was with you the whole time during this stop,

7    correct?

8        A.   Yes.  He's positioned in the rear passenger

9    compartment area behind the driver's side.  We have a kennel

10   installed.

11       Q.   He was -- he did not have to be brought there in a

12   separate vehicle?

13       A.   Correct.

14       Q.   So what happened when you gave Rex his search command?

15       A.   Per my report, he gave a positive indication to the

16   odor of narcotics near the driver door.

17       Q.   And at that point what did you do?

18       A.   Then I have to look in my report.

19            So then as we got onto the passenger's side of the

20   vehicle, he jumped up into the vehicle without my command,

21   eventually leading him to give a positive indication to the odor

22   of narcotics on the leopard-print duffle bag.

23       Q.   Now, at that point did you believe you had probable

24   cause to search the vehicle?

25       A.   Yes.

1    Q.    Inside the vehicle?

2    A.    Yes.

3    Q.    And did you conduct a search of the inside?

4    A.    I did.

5    Q.    And what did you find inside that's of significance?

6    A.    I located a large amount of U.S. Currency concealed

7 within the leopard-print duffle bag.

8    Q.    And what did you do with the currency?

9    A.    I left it where it was and immediately contacted the

10 DEA.

11    Q.    And then what happened?

12    A.    The DEA, multiple DEA agents came to the scene and

13 pretty much took over.

14    Q.    Is it fair to say that that --  did that end your

15 involvement in this particular investigation?

16    A.    No.

17    Q.    Sorry.  It continued after that?

18    A.    Yes.

19    Q.    Now that was regarding the later search of the house

20 on Marvin Gaye Boulevard, correct?

21    A.    I don't recall the exact street, but it was a

22 subsequent search warrant following this traffic stop.

23    Q.    But as far as the search of this vehicle goes and any

24 evidence that was found in the F-150 that -- once DEA came, that

25 ended your involvement with the traffic stop, correct?

```
 1        A.   Yes.

 2        Q.   And that second vehicle, according to your report, Mr.

 3   Rashad was driving now a black Ford F-150 registered to Melanie

 4   Wade; is that correct?

 5        A.   As per my report, yes.

 6        Q.   Now, Officer Bellestri, you've been involved with a

 7   number of traffic stops in conjunction with DEA, correct?

 8        A.   Correct.

 9        Q.   And other federal law enforcement agencies as well?

10        A.   Yes.

11        Q.   Now, are there times when you might stop a vehicle

12   based solely on the request of a fellow officer?

13        A.   Yes.

14        Q.   How commonly do you carry out this role in conjunction

15   with DEA?

16        A.   It's very frequent.  It's considered just to be one of

17   our roles as a canine handler in the, throughout the state, but

18   specifically canine handlers who are training and operating

19   narcotic detection canine teams.

20        Q.   In your career, have there been instances when you've

21   conducted a search of a vehicle based solely on the request of

22   another officer or agency?

23        A.   Yes.

24        Q.   But in this case you described some additional steps

25   that you took.  Why did you go through those steps?
```

```
 1        A.    The DEA informed me that they wanted to protect the

 2   integrity of the wire and the other facts of the investigation

 3   at that time.

 4        Q.    So the steps you took were to develop your own

 5   probable cause to conduct the searches?

 6        A.    Correct.

 7        Q.    And those are all for the reasons that are described

 8   in your two reports, correct?

 9        A.    Yes.

10        Q.    Thank you.

11              MR. FRANZINGER:  No further questions.

12              MR. PERKINS:  Can I have just one second?

13              THE COURT:   Yes.

14              MR. PERKINS:  May I?

15              THE COURT:   You may proceed.

16              MR. PERKINS:  Yes.  Thank you.

17                             CROSS-EXAMINATION

18   BY MR. PERKINS:

19        Q.    Good afternoon, Trooper Bellestri.

20              Am I saying it right?

21        A.    Yes, sir.

22              Good afternoon.

23        Q.    Good afternoon.

24              Sir, I'm going to ask you some questions.  If you

25   don't understand me, let me know so I can offer you a question
```

1   you understand; is that fair?

2       A.   Yes, sir.

3       Q.   Now, you indicated that you were working at least on

4   this particular day --- were you specially assigned to work in

5   conjunction with the agency that you talked about or DEA agents

6   that day?

7       A.   Yes, I was.

8       Q.   Were you also working in a patrol capacity that day

9   outside of that?

10      A.   Yes.

11      Q.   Okay.

12          So, you were performing your job and when you received

13  calls or a call from DEA, then you would take action and take

14  direction from them; is that correct?

15      A.   Correct.

16      Q.   Now -- and a little bit out of order, so to speak, but

17  brother counsel when he was asking you toward the end he says,

18  you were making stops -- sometimes you make stops for, for

19  officers who give you certain information and you'll make stops

20  based on the information that they give you; is that correct?

21      A.   Correct.

22      Q.   You would agree that you're making that stop based,

23  entrusting that that officer has enough, whether it be

24  reasonable suspicion or probable cause, to stop that vehicle; is

25  that correct?

1      A.    Yes, sir.

2      Q.    Even if you yourself have not seen any basis for

3  stopping a vehicle; is that fair?

4      A.    That's correct.

5      Q.    Now, in this situation you described you came into

6  contact with -- you describe coming into contact with Mr. Rashad

7  initially back on November 21st, 2019 around 1 o'clock p.m. is

8  that, or 1 p.m.?

9      A.    Approximately, yes.

10     Q.    And you agree you authored a report in that matter,

11  did you not?

12     A.    I did.

13     Q.    Okay.

14           And in your report you indicate, at least in two areas

15  on that report, which is, I believe Exhibit Number 1, it's

16  indicated at the top, it indicates time received of 1300.

17  That's 1 p.m., is that fair?

18     A.    Yes.

19     Q.    Military time?

20     A.    Correct.

21     Q.    And then in the body of the report it indicates a date

22  and time.  It says, "on or after November 21st, 2019 at 1300",

23  is that fair?

24     A.    Correct.

25     Q.    And if there's anything that I ask you a question and

1    it refresh your memory, please feel free to look at your report,

2    okay?

3         A.   Yes, sir.

4         Q.   All right.

5              I just saw you looking, thinking about it in your

6    head.

7              So, you authored another report, did you not?

8         A.   I did.

9         Q.   And you agree that in that report you also indicated

10   in that report that the time received was 1300 hours; is that

11   correct?

12        A.   Correct.

13        Q.   That's not actually the time that you received the

14   information that's in that report, is that fair?

15             The second, the second stop?

16        A.   Um, it's based on receiving -- how I write my reports

17   is based on receiving the request to assist whatever agency that

18   may be.

19             So, I was requested at 1 p.m. or 1300 hours to begin

20   assisting the DEA.

21        Q.   Okay.  Fair enough.

22             But what I'm asking you is, the time received the

23   information in that report is not 1300, is that fair?

24        A.   Correct.

25        Q.   You'd agree that in this report there's no indication,

 1   I'm talking about the second one.  The second stop there is no

 2   indication as it relates to time in which you made that stop,

 3   other than those two areas in which it indicates the time

 4   received up top at 1300 and in the body of it where it says,

 5   "date and time", it says the same thing, "on or after Thursday,

 6   November 21st, 2019 at 1300 hours", is that fair?

 7        A.   Yes, sir.

 8        Q.   Now, you would agree you've been trained how to write

 9   reports, have you not?

10        A.   Yes, sir.

11        Q.   And that's the specific thing that you've been trained

12   prior to even getting onto the road or doing any official duties

13   as a law enforcement officer; is that correct?

14        A.   That's correct.

15        Q.   You also have been trained to write reports in

16   chronological order, have you not?

17        A.   Yes.

18        Q.   And you understand that the purpose for writing those

19   reports, particularly in a case like this that's six years old,

20   is to recount and refresh your recollection as to those events,

21   is that fair?

22        A.   Yes, sir.

23        Q.   Now, you'd agree that as we look at this report, the

24   only thing a reasonable person would be left to understand that

25   second report is, that the event happened at 1 o'clock, is that

1    fair?

2        A.   Correct.

3        Q.   Now, you stopped Mr. Rashad in the first time you

4    described that it was, you saw a couple of infractions and you

5    based, you stopped that vehicle off of M10, we're talking about

6    the Lodge Freeway, and somewhere near Pembroke; is that correct?

7        A.   Yes, sir.

8        Q.   And when you stopped that vehicle, you didn't offer

9    any citations; is that correct?

10       A.   Correct.

11       Q.   And at that particular time Mr. Rashad was ordered

12   from the vehicle?

13       A.   I'd say I requested, yes.  Requested to remove himself

14   from the vehicle.

15       Q.   Understood.

16            But you would agree that as a reasonable person

17   listens to you, and I'm only basing it upon a reasonable person

18   standard, is that when you make a request that that is received

19   as an order, is that your understanding, is that fair?

20       A.   It could be, yes.

21       Q.   Okay.

22            Now, at that point in time when you removed him from

23   the -- or he was removed, or got out of the vehicle, fair

24   enough?

25       A.   Yes.

1    Q.   He got out of the vehicle, you then did a search with
2    your canine initially; is that correct?
3    A.   Yes.
4         On the first?
5    Q.   First stop?
6    A.   After obtaining verbal consent.
7    Q.   Right.
8         I didn't want to leave that out. You're right.
9         He gave you verbal consent to search the vehicle,
10   correct?
11   A.   Correct.
12   Q.   You'd agree on the second stop he didn't give you
13   verbal consent, correct?
14   A.   He did not.
15   Q.   And he also indicated:  "This is not my truck.  I
16   don't have a right to give you consent", is that fair?
17   A.   Correct.
18   Q.   Now, he also indicated that he had no knowledge or
19   information as it relates to what the contents of the interior
20   of that truck had or that bag also; is that correct?
21   A.   Correct.
22   Q.   Now, going to that first stop, you indicated that
23   there was an indication of some -- just one moment -- indication
24   to the odor of narcotics, correct?
25   A.   Correct.

1       Q.   On the first stop?

2       A.   Yes.

3       Q.   You didn't retrieve or preserve anything as far as

4  evidentiary value from that first stop, is that fair?

5       A.   Correct.

6       Q.   All right.

7            You made no other notations or there were no narcotics

8  located in that vehicle; is that correct?

9       A.   Right.

10           No contraband was located on that initial stop,

11  correct.

12      Q.   Okay.

13           Now, you indicated you didn't retain the work gloves

14  that you described in your report?

15      A.   I did not.

16      Q.   You would agree that that would have some evidentiary

17  value, fair enough?

18      A.   I would agree with that.

19      Q.   Now, you went to -- now you talked about -- your dog

20  is Rex?

21      A.   At the time it was Canine Rex, yep.

22      Q.   Canine Rex.   Okay.

23           Let me ask you, how long had you -- at that point in

24  time, how long had you and Rex been working together?

25      A.   So we began training -- I began training and became a

1    canine handler in March of 2017.

2              So, probably just over two years at that point.

3        Q.    Okay.

4              Rex was your first partner?

5        A.    He was, yes.

6        Q.    First canine partner?

7        A.    Yes.

8        Q.    When you were working this particular day, are you

9    working just solely with yourself and Rex?

10       A.    Yes.

11       Q.    Okay.

12             Oh, you said that Rex was trained to detect what type

13   of narcotic?

14       A.    Marijuana, crack, cocaine, meth, and heroin.

15       Q.    And when was the last time -- you get training and you

16   also are involved in the training of Rex, are you not?

17       A.    Correct.

18       Q.    When is the last time -- and you have to continue --

19   almost just like you go for training as an officer at least once

20   or twice a year for the purposes of maintaining certifications,

21   do you not?

22       A.    Yes.

23       Q.    Just as a regular officer or trooper?

24       A.    Correct.

25       Q.    You do the same type of protocols for your canine

1    partner, with Rex, is that fair?

2         A.    Correct.

3         Q.    And you're involved in that training, correct?

4         A.    Yes, I am.

5         Q.    When was the last time -- before this incident, when

6    was the last time you and Rex had gone to training?

7         A.    I do not recall.

8         Q.    Okay.

9              Let me ask you, on a yearly basis, how often would you

10   typically train with your partner Rex at the time?

11        A.    So we trained once a week, that's typically every

12   Thursday.  We pick out a -- we train once a week as a team and

13   then we are given a yearly evaluation hosted by our canine

14   kennels in Lansing for all the disciplines that our canine teams

15   specialize in.

16        Q.    All right.

17             Now, when -- after this first stop, how long did that

18   stop take place, or how long did it take to initiate the stop

19   and conclude the stop and allow -- at some point in time, Mr.

20   Rashad drove on his way?

21        A.    Between -- for the first stop?

22        Q.    Yes.

23        A.    I don't recall.

24        Q.    You have an estimate or --

25        A.    It would be a guess.

1    Q.   That's right.  All right.  Let's not guess.

2    A.   Okay.

3    Q.   So at some point in time you were then directed -- you

4  mentioned someone had told you to focus your attention and make

5  a stop on this vehicle initially, on the 1 o'clock stop,

6  correct?

7    A.   Correct.

8    Q.   Who told you to do that?

9    A.   I don't know specifically who, but it was an agent of

10  the DEA.

11    Q.   Okay.

12         So how were you communicating:  Telephonic or via

13  dispatch?

14    A.   It was both through our cell phones and then via radio

15  on a separate channel that they have.

16    Q.   Okay.

17         Are you aware whether or not any of the dispatch

18  records were preserved?

19    A.   I'm not aware.

20    Q.   You never made any attempts to do so; is that correct?

21    A.   I did not.

22    Q.   Now, ultimately, there's a second time you were told

23  to give attention to making a, told to make a stop; is that

24  correct?

25    A.   Correct.

```
 1        Q.    And you're actually told to make a stop, but you chose
 2   to, because of reasons that you stated, you didn't want to alert
 3   to a wire, you chose to wait and see other reasons to make a
 4   stop; is that correct?
 5        A.    Correct.
 6        Q.    All right.
 7              So you -- would it be fair to say, as you indicated,
 8   this car that you saw, or vehicle, the second F-150, correct?
 9        A.    Yes.
10        Q.    Different F-150, correct?
11        A.    Yes.
12        Q.    Is it different in color or the same color?
13        A.    I'd have to look at the report.
14        Q.    If that would refresh your memory.
15        A.    Okay.
16        Q.    Give me the answer to the question.
17              I think, it's a different color, but go ahead.
18        A.    It is a different color.
19        Q.    Okay.
20              The first one that you stopped -- well, let me ask you
21   -- let's talk about the second one.
22              The second one is a black Ford pick-up?
23        A.    Correct.
24        Q.    All right.
25              Do you recall where you were when you were told to
```

1    stop this vehicle?

2         A.   I do not recall, no.

3         Q.   Okay.

4              Fair to say that without the benefit of a report, it

5    would be hard to testify today with any particular accuracy, is

6    that fair?

7         A.   Yes.

8         Q.   All right.

9              Done a lot of traffic stops between now and six years?

10        A.   Yes, I have.

11        Q.   Are you still working canine patrol?

12        A.   Yes.

13        Q.   So, is Rex still with you?

14        A.   He is not.

15        Q.   Okay.  Sorry.

16             Now, in that second stop, you testified today that

17   this car went through a yellow light; is that correct?

18        A.   Correct.

19        Q.   You'd agree that going through a yellow light in and

20   of itself is not, is not a ticketable offense, is that fair?

21        A.   The law is, is that if the vehicle enters the

22   intersection as the light is yellow, that is a ticketable

23   offense.

24        Q.   You believe that to be the law?

25        A.   Yes.

1      Q.   Okay.

2           And it was entering the intersection and the light

3      turned yellow, correct?

4      A.   I don't recall for this incident.

5      Q.   All right.  Fair enough.

6           But your testimony was that it was a yellow light and

7      that was the basis why you stopped it, correct?

8      A.   Based on my report the yellow light actually turned

9      red as the vehicle was still in the middle of the intersection.

10     Q.   So -- and you'd agree that if a vehicle is not able to

11     stop with an assured clear distance, it's allowed to go through

12     a yellow light, is that fair?

13     A.   Yes.

14     Q.   Okay.

15          Now you stopped this vehicle nonetheless?

16     A.   Yes.

17     Q.   You didn't give a ticket at the second incident

18     either, is that fair?

19     A.   That's correct.

20     Q.   Okay.

21          You were all -- well, there were other things more

22     important, is that fair?

23     A.   That's correct.

24     Q.   So, you at this point in time, at this second time you

25     then ordered them from the vehicle, did you not?

1          When I say, "them", I mean Mr. Rashad and Mr.

2     Martinez?

3          A.   Yes.

4          Q.   And you ordered them from the vehicle and you'd agree

5     at that particular time you saw -- you individually saw no

6     traffic offense, correct?

7          I mean, you saw nothing, what you believed -- you

8     understand I disagree with you, right, by the way I'm asking you

9     questions?

10         A.   You disagree with me?

11         Q.   About the traffic offense?

12         A.   Yes.  I understand that, yes.

13         Q.   Okay.

14         But other than that, you saw no other infraction,

15     correct?

16         A.   Correct.

17         Q.   And you would agree that as you write reports, as you

18     have used that for the benefit of your recollection today, it's

19     important to put the most salient and most important factors in

20     your report, correct?

21         A.   It is.

22         Q.   You'd agree that if you saw him milling around as you

23     pulled the vehicle over, that would be something very important

24     to put into your report, correct?

25         A.   Yes.  Yes.

1          Q.    If you saw -- if you saw just like on the other

2    report, you indicated you saw tinted windows and changing lanes;

3    is that correct?

4                That was important to put in there?

5          A.    Yes.

6          Q.    All right.

7                And at that point you ordered them from the vehicle,

8    and they weren't free to leave at that point, correct?

9          A.    They were not free to leave, correct.

10         Q.    And I know brother counsel described they're not under

11   arrest, but they're still without their freedom to leave that

12   area?

13         A.    Correct.

14         Q.    And at that point in time you began to question them,

15   did you not?

16         A.    Yes.

17         Q.    And you were questioning them for the furtherance of

18   an investigation; is that correct?

19         A.    Yes.

20         Q.    And understanding that these are individuals you

21   describe -- well, let me ask you this.

22               You earlier -- until you were told to stop that

23   vehicle, you weren't told anything about a Mr. Rashad; is that

24   correct?

25               The first -- I'm sorry.  I'm jumping back.

```
1          A.    Okay.

2          Q.    I apologize, but I'm jumping back.

3                When you were initially told to stop that F-150,

4    different in color than the black second stop, you didn't know a

5    name or anything; is that correct?

6          A.    To my recollection, this was the first time I was

7    aware of who Mr. Rashad was, yes.

8          Q.    And, in fact, you were the individual who gave the

9    agents the name of the individual because they didn't know to

10   the best of your recollection, is that fair?

11         A.    No.

12         Q.    That's not fair or you don't know?

13         A.    I do not know.

14         Q.    Fair enough.

15               So, on -- when they weren't free to leave, again, you

16   said that you didn't give them Miranda, correct?

17         A.    Correct.

18         Q.    Yet they weren't free to leave; is that correct?

19         A.    Correct.

20         Q.    So, why didn't you give Miranda?

21         A.    At that time they were not under arrest, but they were

22   detained based on the -- they were detained because of my

23   traffic violation, but also the information I had received from

24   the DEA that I did not disclose to them.

25         Q.    So, understanding all of that and based upon the
```

1    information you received from the DEA, and ordering them from

2    the vehicle, you weren't -- it was your intention to hold them

3    until the DEA got there, correct?

4        A.   Had I located contraband, yes.  If I did not locate

5    contraband, no.

6        Q.   Now, at this point in time you asked for the right to

7    search that vehicle, correct?

8        A.   Yes.  At some point, yes.

9        Q.   Yes.

10            At some point in time during the conversation not only

11   of Mr. Rashad, but also Mr. Martinez, correct?

12       A.   Did I ask Mr. Martinez if I could search, is that --

13       Q.   I'll withdraw that.  I don't think you did.  I'm not

14   sure if you did.  That's not important here.

15            But Mr. Rashad said, no; is that correct?

16       A.   Correct.

17       Q.   You'd agree that his availing of that right -- he has

18   a right to say, no, does he not?

19       A.   That's correct.

20       Q.   And you'd agree his availing of that right to say, no,

21   and him saying, yes, earlier, it caused you some consternation

22   in your mind; is that fair?

23       A.   Can you define consternation?

24       Q.   That wasn't a good way.

25            It gave you, or it aroused your senses as to the

1    desire to search that vehicle, is that fair?

2        A.   Yes.

3        Q.   Yet you recognized that's his right to say, no?

4        A.   Yes.

5        Q.   Now, let me ask you something about the second report.

6    That report you recognize -- did you ever make any efforts to

7    amend your report to give a specific time of that second stop?

8        A.   No.

9        Q.   Okay.

10            And you recognize there's a process as an author of

11   reports working at the Michigan State Police Department, there's

12   protocols and practices that you can amend your reports, right?

13       A.   Yes.

14       Q.   Oh, I meant to ask you this.

15            Did you have and do you author activity logs during

16   the course of the tour of duty, particularly, on November 21st,

17   2019?

18       A.   I do.

19       Q.   Okay.

20            If ordered to do so, could you produce that?

21       A.   Yes.

22       Q.   Now, also you indicated at some point in time you went

23   to check to see the video from the scout car; is that correct?

24       A.   Yes.

25       Q.   Did you have, or were you equipped with body-warn

 1    camera that day?

 2         A.   I don't think we had them issued yet.

 3         Q.   Your activity log would reflect whether or not you

 4    were equipped with body-warn camera, is that fair?

 5         A.   It should.

 6         Q.   So you indicated that you went to look for scout car

 7    video at some point in time.  Who directed you to do that?

 8         A.   The prosecutor.

 9         Q.   Okay.

10              When was that sought?

11         A.   As -- recently.

12         Q.   So, as a result of this particular event back on

13    November 21st, it wasn't secured in any particular way to

14    preserve for later and future purposes?

15         A.   Yeah.  I don't believe it was requested to be

16    preserved before that time recently.

17         Q.   Don't you find that odd?

18         A.   With the volume of canine requests that I handle, it

19    was not my concern.

20         Q.   I understand it's not your concern.  But you would

21    agree that this is significant seizure, is it not?

22         A.   Yes.

23         Q.   And in a significant seizure, it also requires, just

24    like the protocol that you employed for the purposes of making

25    sure it was done properly, that would have as much importance

1    preserving it, is that fair?

2        A.   I would say it's important to preserve it, yes.

3        Q.   Okay.

4             If -- you were told -- you said you were told that

5    there was a corruption of evidence or I'm assuming digital

6    evidence in your department for the period in time in which you

7    were searching for that evidence; is that correct?

8        A.   Yeah.  It was described to me that multiple video

9    files that year were, specifically at the metro south post, were

10   corrupted or damaged and became erased or unable to be viewed.

11       Q.   Okay.

12            Now, there would be a report of that to that extent,

13   is that fair?

14       A.   I'm not sure.

15       Q.   Who did you ask and who did you talk to about that?

16            Who gave you that information?

17       A.   A sergeant at the metro south post.  Sergeant Boike.

18       Q.   Boike?

19       A.   Boike, yes.

20       Q.   Okay.  B-O-I-K-E?

21       A.   Yes.

22       Q.   Now, you would agree that as a basis for your stop,

23   which was a civil infraction, and the lack of any movement in

24   the interior of that vehicle, that doesn't -- that in and of

25   itself, those two factors does not give you a right to order

1   them from the vehicle; is that correct?

2           That being, Mr. Rashad and Mr. Martinez on the second

3   stop?

4       A.   I have a right to order anyone to exit the vehicle at

5   any time during a traffic stop.  I don't need to see further

6   movement or anything of that nature?

7       Q.   So you believe -- that's your belief, is that fair?

8       A.   Yes.

9       Q.   And you'd agree that -- in your report in your second

10  report, it -- there's a statement -- and the reason I know how

11  to spell "Boike" is because it's in your report.

12          What does it mean when you say, "Sergeant Boike

13  approved me for this incident"?

14      A.   Yes.

15      Q.   What does that mean?

16      A.   Excuse me.  Every time we receive a canine request, we

17  are to seek approval to assist with that request from the

18  on-duty Sergeant, which at the time was Sergeant Boike.

19          He is not -- that's it.

20      Q.   Other than in this stop that you made, other than the

21  location of the discovery -- I'm sorry.  Of U.S. Currency, there

22  was no other, there was no contraband retrieved, is that fair?

23      A.   Correct.

24      Q.   Because in and of itself, currency is not contraband,

25  is that fair?

1     A.   By itself, no.

2     Q.   Now, you described in your direct testimony, earlier

3  on you described a primary subject, and you were talking about,

4  this is at the first stop, you mentioned that in reference to

5  Mr. Rashad; is that correct?

6     Do you recall saying that earlier?

7     A.   Yes.

8     Q.   Okay.

9     But you didn't have any information, or you were

10  provided no other information about who this individual was; is

11  that correct?

12     A.   I believe I was provided -- I would have been provided

13  information on who he was and why he was being investigated and

14  other circumstances of the case.

15     Q.   Okay.

16     So you're saying that because of protocol or are you

17  saying that because of memory?

18     A.   Based on my own protocol.  I always ask very pertinent

19  questions to who they're investigating; why they're

20  investigating him, again, to cover my actions as well as concern

21  for my safety.

22     Q.   All right.

23     You -- let me ask you.  How were you in -- in the

24  first -- I'm going to go to the first and then I'm going to do

25  the second.

1          How are you in a -- how were you told to follow this

2   vehicle -- or what put you in proximity of this vehicle in the

3   first place?

4          A.   It would have been information relayed to me by

5   surveillance units.

6          Q.   Okay.

7               And was that the second situation, too?

8          A.   Yes.

9          Q.   Okay.

10              You yourself were not conducting surveillance as you

11  were in a marked scout car, is that fair?

12         A.   Correct.

13         Q.   Not scout car.  But a marked MSP vehicle?

14         A.   Yeah.  A Michigan State Police Tahoe.

15         Q.   Tahoe.  Okay.

16              Back when you were using the WatchGuard database for

17  your vehicles?

18         A.   I'd have to look at my reports.

19              Is that what's documented?

20         Q.   Yes.

21         A.   Then, yes.

22         Q.   On the last -- on the second report --  I don't think

23  it's -- no.  The first one, too.

24              On the third page of the second report, it indicates

25  that that would -- the recorded would be -- any video recording

1    would be saved on the WatchGuard database?

2         A.   Yes.

3         Q.   So you were using that service or that software at the

4    time?

5         A.   Correct.

6         Q.   Now, you made a determination of deception based upon

7    when you talked to those individuals, that being, Mr. Rashad or

8    Mr. Martinez, because you'd be -- or you determined were

9    conflicts in the story, correct?

10        A.   Correct.

11        Q.   If you were dealing with them individually, you

12   wouldn't be able to determine that there was any deception; is

13   that correct?

14        A.   No.

15        Q.   That's a correct statement?

16        A.   That's not a correct statement.

17             I would be able to detect acts of deception even when

18   interviewing and speaking with people by themselves.

19        Q.   Now, you've never met, other than seeing Mr. Rashad

20   earlier that day, correct?

21        A.   Correct.

22        Q.   This is only the second time you had met Mr. Rashad?

23        A.   Yes.

24        Q.   The second stop?

25        A.   Yes.

1        Q.   You had never met Mr. Martinez, correct?

2        A.   Correct.

3        Q.   So you don't know their manner and affect other than

4   Mr. Rashad just earlier that day, is that fair?

5        A.   Correct.

6        Q.   You don't know whether either of these individuals are

7   typically nervous individuals; is that correct?

8        A.   Correct.

9        Q.   You don't know, in fact, whether or not they're

10  nervous; it just appears to you an element of nervousness, is

11  that fair?

12       A.   Correct.

13            But in particular in this case, I did have the prior

14  stop to reference Mr. Rashad's behavior.

15       Q.   Understood.

16            Just one moment.

17            But for being told by this surveillance agents, or

18  agent, surveilling this vehicle or these vehicles, you wouldn't

19  have made these stops, correct?

20       A.   What -- what brought me to make these stops on Mr.

21  Rashad that date was specific request of the DEA, yes.

22       Q.   Okay.

23            Also that second vehicle you described, I don't know

24  if brother counsel elicited that from you, that vehicle was not

25  registered to Mr. Rashad; is that correct?

1      A.    The second vehicle was not.

2      Q.    Okay.  Thank you.

3            THE COURT:   All right.

4            Any redirect?

5            MR. FRANZINGER:  Yes, your Honor.

6                       REDIRECT EXAMINATION

7  BY MR FRANZINGER:

8      Q.    Officer Bellestri, regarding what time the second stop

9  took place, you would agree it was after the first stop,

10 obviously?

11     A.    Yes.

12     Q.    Do you recall whether it was light or dark out at that

13 point?

14     A.    The second stop was dark.

15     Q.    Now, the steps you took during -- let's focus on the

16 second traffic stop, the steps you took there.

17           You mentioned earlier your interdiction training.  Was

18 asking the -- was asking the occupants to step out of the

19 vehicle consistent with interdiction training?

20     A.    Yes.

21     Q.    What about the nature of the questions that you asked

22 the occupants, was that also consistent with that training?

23     A.    Yes.

24     Q.    And the temporary detention then, was that also

25 consistent with your training?

1     A.    Yes.

2     Q.    And one last set of questions here.

3           You mentioned that Rex was trained to alert to the

4   odor of certain narcotics.  But in this case there were no

5   narcotics found in the vehicle, right?

6     A.    Correct.

7     Q.    So Rex alerted on the leopard bag, right?

8     A.    Yes.

9     Q.    Why?

10    A.    Just the theory that U.S. Currency, specifically being

11  made of cotton --

12          MR. PERKINS:  I would object to that, for one, I

13  believe he's indicated this is a theory.  The lack of foundation

14  that he can provide --

15          MR. FRANZINGER:  I can rephrase.  Let me try and

16  rephrase.

17    Q.    (By Mr. Franzinger, continuing)  Have you had

18  circumstances where Rex had alerted on currency before?

19    A.    Yes.

20    Q.    Is that something that -- do you receive training on

21  looking for currency during interdiction?

22    A.    I do.

23    Q.    Is there any special training that Rex receives to --

24  regarding currency?

25    A.    Yes.  There is.

1       Q.   What is that?

2       A.   We specifically run our narcotics detection canines on

3  U.S. Currency that is not circulated to ensure that they are

4  proofed off of it, meaning that they will pay no attention to

5  the odors of U.S. Currency itself, but only the fact that

6  they're giving indication to the odor of narcotics that they are

7  trained on.

8       Q.   So had their been other traffic stops where Rex had

9  alerted on U.S. Currency?

10      A.   Yes.

11      Q.   And you -- actually, Rex was killed, correct?

12      A.   Correct.

13      Q.   So you have a new canine now?

14      A.   Yes.

15      Q.   And has that canine also alerted onto U.S. Currency in

16  other traffic stops?

17      A.   Yes.

18      Q.   Thank you.

19           THE COURT:   All right.  Officer Bellestri, you may

20  step down.

21      (At 3:47 p.m. witness excused)

22           THE COURT:  When are we going to have the other

23  witness?

24           Mr. Franzinger, are you going to get in touch with the

25  agent on the case?

```
 1              MR. FRANZINGER:  I will.  Yes, your Honor.  I'll do
 2    everything I can to try to find him.
 3              I know he's local.  He should, unless something
 4    happened, but I will do my best to locate him as soon as
 5    possible.
 6              THE COURT:  Okay.
 7              And so, I'm tempted to have you let Mr. Perkins know
 8    when you reach him, and I'd really like to continue this within
 9    the next two weeks.
10              MR. FRANZINGER:  Agreed.
11              MR. PERKINS:  All right.
12              THE COURT:  Can we all do that?
13              MR. PERKINS:  I call him regularly.
14              THE COURT:  Okay.
15              MR. PERKINS:  I've got some other business for him,
16    too.
17              THE COURT:  Okay.  All right.
18              Then we'll officially be in recess and I'll look to
19    hear from you all sometime in the next two weeks.  Actually, I'd
20    like to do the hearing within two weeks.
21              MR. FRANZINGER:  Understood.  Yes.
22              THE COURT:  Why don't you contact us within a week.
23              MR. FRANZINGER:  Okay.  I will do that.
24              THE COURT:  Okay.  All right.
25              Then, we'll officially be in recess and I'm going to
```

1  instruct my court reporter not to put anything else on the

2  record.

3       (Pause)

4            THE COURT:   We'll be in recess.   Thank you.

5            THE LAW CLERK:  All rise.   Court is in recess.

6       (At 3:50 p.m. proceedings concluded)

7

8                    C E R T I F I C A T E

9            I, Merilyn J. Jones, Official Court Reporter of the

10  United States District Court, Eastern District of Michigan,

11  appointed pursuant to the provisions of Title 28, United States

12  Code, Section 753, do hereby certify that the foregoing pages

13  1-59 inclusive, comprise a full, true and correct transcript

14  taken in the matter of the United States of America versus

15  Dwight Rashad, 21-cr-20746 on Tuesday, October 14, 2025.

16

17

18                         /s/Merilyn J. Jones
                           Merilyn J. Jones, CSR 0935, RPR
19                         Federal Official Reporter
                           231 W. Lafayette Boulevard
20                         Detroit, Michigan  48226

21  Date: November 11, 2025

22

23

24

25